COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-08-259-CV

 

 

IN THE INTEREST OF J.M., A CHILD                                                       

 

                                                                                                        

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction

In four issues, Appellant E.J. (hereinafter AMother@) and
Appellant J.W.M. (J.M.=s alleged biological father and
hereinafter AFather@)[2]
separately appeal the termination of their parental rights to J.M.  We affirm.

 








II. Factual and Procedural History

J.M. was born on June 10, 2007.  Mother tested positive for cocaine before
J.M.=s birth,
when she was admitted to the hospital following an alleged domestic violence
incident with Father.  She testified that
J.M. tested positive for cocaine when he was born seventeen days later.  A safety plan was developed for J.M., and
Mother voluntarily placed him with C.M., one of her adult daughters, where he
remained until Child Protective Services (ACPS@)
discovered that C.M. allowed Mother and Father unsupervised contact with J.M.,
in violation of the safety plan.[3]  CPS removed J.M. on June 19, 2007, and placed
J.M. into foster care because no suitable relatives were available.[4]









Mother and Father both received service plans
from CPS.  These plans required visiting
J.M. on a weekly basis; completing psychological and drug assessments;
completing parenting classes and domestic violence classes; obtaining safe,
stable, and appropriate housing; and obtaining gainful and stable employment.  The CPS caseworker, Shawna Wells, testified
that on several occasions she discussed with Mother and Father the importance
of completing the service plans.  Mother
and Father testified that they understood their service plans.[5]  Neither Mother nor Father completed the
service plans.

The trial court terminated Mother=s
parental rights, finding that Mother knowingly placed or knowingly allowed J.M.
to remain in conditions or surroundings that endangered his physical or
emotional well‑being; that Mother engaged in conduct or knowingly placed
J.M. with persons who engaged in conduct that endangered J.M.=s
physical or emotional well-being; that Mother had been the cause of J.M.=s
addiction to cocaine at birth; and that termination of her parental rights was
in J.M.=s best
interest.  See Tex. Fam. Code
Ann. ' 161.001(1)(D), (E), (R),
(2) (Vernon Supp. 2008).








The trial court also terminated Father=s
parental rights, finding that Father knowingly placed or knowingly allowed J.M.
to remain in conditions or surroundings that endangered his physical or
emotional well‑being; that Father engaged in conduct or knowingly placed
J.M. with persons who engaged in conduct that endangered J.M.=s
physical or emotional well-being; that Father had constructively abandoned
J.M.; and that termination of his parental rights was in J.M.=s best
interest.  See id. ' 161.001(1)(D),
(E), (N), (2).  Both parents appealed.

III. Legal and Factual Sufficiency

Mother complains that the evidence is legally and
factually insufficient to support the trial court=s
findings under sections 161.001(1)(D), (E), and (R) and that the evidence is
factually insufficient to support the trial court=s best
interest finding.  Father complains that
the evidence is legally and factually insufficient to support the trial court=s best
interest finding and its findings under sections 161.001(1)(D), (E), and (N).

A. Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the
State seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination decisions must be supported by clear
and convincing evidence.  Tex. Fam. Code
Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ Id. ' 101.007
(Vernon 2002).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).








In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and we must disregard contrary evidence unless a
reasonable factfinder could not.  Id.

We must therefore consider all of the evidence,
not just that which favors the verdict. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the factfinder=s province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s determinations
as long as they are not unreasonable.  Id.
at 573.

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that
Mother violated subsections (D), (E), or (R) of section 161.001(1), that Father
violated subsections (D), (E), or (N) of section 161.001(1), and that the
termination of the parent-child relationship would be in the best interest of
the child.  C.H., 89 S.W.3d at
28.  If, in light of the entire record,
the disputed evidence that a reasonable factfinder could not have credited in
favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108. 








B. Endangerment under Subsections (D) and (E)








Endangerment is defined as exposing to loss or
injury, to jeopardize.  In re J.T.G.,
121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.).  Under subsection
(D), it is necessary to examine evidence related to the environment of the
child to determine if the environment was the source of endangerment to the
child=s
physical or emotional well‑being. 
In re D.T., 34 S.W.3d 625, 632 (Tex. App.CFort
Worth 2000, pet. denied).  To support a
finding of endangerment, the parent=s
conduct does not necessarily have to be directed at the child, nor is the child
required to suffer injury.  Boyd,
727 S.W.2d at 533.  Rather, a child is
endangered when the environment or the parent=s course
of conduct creates a potential for danger that the parent is aware of but
disregards.  In re S.M.L., 171
S.W.3d 472, 477 (Tex. App.CHouston
[14th Dist.] 2005, no pet.). 
Inappropriate, abusive, or unlawful conduct by persons who live in the
child=s home
or with whom the child is compelled to associate on a regular basis in his home
is a part of the Aconditions or surroundings@ of the
child=s home
under section 161.001(1)(D).  In re J.L.W.,
No. 02-08-00179-CV, 2008 WL 4937970, at *6 (Tex. App.CFort
Worth Nov. 20, 2008, no pet.) (mem. op.); see also In re W.S., 899
S.W.2d 772, 776 (Tex. App.CFort
Worth 1995, no writ) (Aenvironment@ refers
not only to the acceptability of living conditions, but also to the parent=s
conduct in the home).  A parent need not
know for certain that the child is in an endangering environment; awareness of
such a potential is sufficient.  See
S.M.L., 171 S.W.3d at 477.

Under subsection (E), the relevant inquiry is
whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, and failures to act.  J.T.G., 121 S.W.3d at 125.   Termination under subsection (E) must be
based on more than a single act or omission; a voluntary, deliberate, and
conscious course of conduct by the parent is required.  Id.; D.T., 34 S.W.3d at 634. 








To determine whether termination is necessary,
courts may look to parental conduct occurring both before and after the child=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).  The factfinder may infer from past conduct
endangering the child=s well‑being that similar
conduct will recur if the child is returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 267 n.39, and C.H., 89
S.W.3d at 26.  Drug abuse during
pregnancy constitutes conduct that endangers a child=s
physical and emotional well‑being. See In re W.A.B., 979 S.W.2d
804, 806 (Tex. App.CHouston [14th Dist.] 1998, pet.
denied) (upholding termination where mother used illegal drugs during and after
pregnancy), disapproved of on other grounds, J.F.C., 96 S.W.3d at 267
n.39; Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).  Conduct that subjects a
child to a life of uncertainty and instability also endangers the child=s
physical and emotional well‑being. 
See In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan Antonio
1998, pet. denied) (using illegal drugs and violating parole provided
sufficient evidence of endangerment). 
While imprisonment alone is not a basis to terminate a parent=s
rights, it is an appropriate factor to consider because when a parent is
incarcerated, he or she is absent from the child=s daily
life and unable to provide support to the child, negatively impacting the child=s living
environment and emotional well-being.  See
S.M.L., 171 S.W.3d at 478B79. 

Because the evidence pertaining to subsections
161.001(1)(D) and (E) is interrelated, we may conduct a consolidated
review.  In re M.C.T., 250 S.W.3d
161, 169 (Tex. App.CFort Worth 2008, no pet.); see
also In re M.R., 243 S.W.3d 807, 819 (Tex. App.CFort
Worth 2007, no pet.) (holding that there was legally and factually sufficient
evidence of both endangerment grounds when, among other things, the evidence
showed that the mother exposed her children to domestic violence and refused to
participate in her CPS service plan).

 








1. Mother

Mother contends that the evidence is legally and
factually insufficient to support the trial court=s
endangerment findings.  In support of her
argument, Mother cites to portions of trial testimony in which she testified
that she stopped using illegal drugs around a month before trial and that she
now completely rejects illegal drugs and would do whatever it takes to be
reunited with her son.  She references Areasonable
efforts@ to
complete her service plan, asserts that the record shows that she was able to
maintain stable housing and to obtain employment, and contends that no evidence
was offered at trial that she ever engaged in any act or omission that could be
construed as physical abuse, emotional abuse, or neglect of J.M.








However, Mother admitted that she used crack
cocaine while she was pregnant with J.M., admitted that she knew that cocaine
could endanger the fetus, and testified that she had been using drugs for
fifteen years.  Mother also testified
that she did not think that it was dangerous for a newborn to be born with
cocaine in his system, and she testified that two of her other children were
also born with cocaine in their systems. 
Mother testified that she and Father used drugs together six to eight
months before the termination trial, that she had last used cocaine a month
before trial, that she was now tired of using cocaine, and that, by trial, she
had been Aclean@ for a
month.  Wells, the CPS caseworker,
testified that when Mother did not show up for one of her visits with J.M., she
asked Mother=s mother, B.M., to take her to
find Mother.  B.M. took Wells to a Aknown
crack house,@ which had no doors, holes in
the walls, and broken windows.  Wells
testified that she found Mother there, surrounded by drugs, pills, and other
drug users, that she was concerned for her own safety while there, and that
Mother refused to leave the crack house and go with Wells to visit her son.








Testimony about Mother=s
conduct both before and after J.M.=s birth
could have led the trial court to reasonably form a firm belief or conviction
that Mother engaged in a course of conduct that endangered J.M.=s
physical or emotional well-being by her use of cocaine during her pregnancy
with J.M.  The trial court could have
also reasonably concluded that Mother would continue to abuse cocaine, despite
her testimony that she was tired of using it and that she had been drug-free
for a month.  See J.P.B., 180
S.W.3d at 573B74; C.H., 89 S.W.3d at
28; D.M., 58 S.W.3d at 812B13; W.A.B.,
979 S.W.2d at 806B07; D.L.N., 958 S.W.2d at
941; see also Tex. Fam. Code Ann. ' 161.001(1)(E).  Therefore, we conclude that the evidence of
endangerment under section 161.001(1)(E) is legally and factually sufficient,
and we overrule Mother=s first issue.  See Tex. R. App. P. 47.1; In re
E.M.N., 221 S.W.3d 815, 821 (Tex. App.CFort
Worth 2007, no pet.) (stating that, along with a best interest finding, a
finding of only one ground alleged under section 161.001(1) is sufficient to
support a judgment of termination).  

2. Father

Father claims that there is no evidence that he
endangered J.M.  With regard to Father=s own
drug issues, he testified that he did not use drugs when Mother was pregnant
with J.M. and that the last time he used illegal drugs was around 2004.  Wells testified, however, that Father
admitted to her that he used marijuana in August 2007, and that he used cocaine
in September 2007.  She also testified
that Father told her that he had been using Percocet, Vicodin, Darvocet, and
alcohol and that she never saw a prescription for the drugs.  Mother testified that the last time she had
used drugs with Father was six to eight months before trial, i.e., sometime
between October and December 2007. 








When asked if he had admitted to a CPS caseworker
that he had been using cocaine and that if he were drug tested, too many things
would show up, Father responded that he did not remember saying that, and
stated, AI would
never admit to use of an illegal substance . . . . I wouldn=t sit up
here on this stand and admit to you that I use drugs . . . [i]f I was.@  He testified that he did not admit to the CPS
caseworker that he had smoked marijuana, responding, AI admit
a lot of things.  I don=t think
I admitted smoking marijuana.  I don=t even
like marijuana.@ 
He testified that he did not admit to a CPS caseworker that he used
cocaine in September 2007 because AI would
not admit to anyone that I used any drugs that are illegal.@  He testified that he remembered admitting to
the CPS caseworker that he used Percocet, Vicodin, and Darvocet, and that he
used alcohol, and he testified that he did not use any drugs that were not his
prescription.

With regard to his knowledge of Mother=s drug
use, Father testified that he was Anotified
that [Mother] was using [drugs], but I reallyCat that
time when she was pregnant, I couldn=t really
say she was using because I didn=t
actually see her use.@ 
He testified that he did not get any information that his son was
positive for drugs Auntil after the fact.@  But he also testified that he and Mother had
been together for around two-and-a-half years, although they never lived
together and only Aspent nights together,@ and he
acknowledged that he watched her go through withdrawal during her pregnancy.

Father also denied physically assaulting Mother.  He stated, 








I mean, we=ve had our littleC[f]irst of all, I don=t hit women.  Okay? 
We=ve had our little
wrestle-arounds, and she doneCshe done got ahold of me a couple of times.  I made her so mad that she didn=t want to talk to me for
a couple of days. . . . An incident came up about some fly spray or
something.  She has high blood
pressure.  We were wrestling over a
bottle of fly spray, some Off, and she passed out and the ambulance came.  But she was already pregnant, too, at the
same time.  So she was ripping and
running and cutting up herself at that time also.  So she wasn=t taking care of
herself.  She wasn=t eating right or
anything like that, and I was really concerned about her because she was
pregnant with [J.M.] at that time.  There
was no report filed about that,[6]
but this is the stuff I get.  I got all
the feedback behind that.

 

He testified that this was the incident that led to Mother=s trip
to the hospital before J.M.=s
birth.  Mother remained in the hospital
from May 24, 2007, until she gave birth to J.M. on June 10, 2007.

Father testified that he was on parole for a 1991
felony conviction for delivering a controlled substance, for which he received
a twenty-five-year sentence because he was a habitual offender with two prior
felony convictions.  He was released on
parole in 2003 after spending ten years and eight months in prison.  Father testified that before the termination
trial, he was in the Ainmate sanction facility@ for
sixty days for failure to report to his parole officer because he Ajust got
a little hard-headed, frustrated,@ and Astressed
out,@ and
because he did not want to report.[7]  Wells testified that CPS had concerns that if
J.M. were placed with Father and Father=s parole
were revoked again, J.M. would have to be sent back into foster care. 













Having reviewed the evidence in the light most
favorable to the finding and judgment, we conclude that the evidence is legally
sufficient because the trial court, as the judge of witness credibility, could
have reasonably disbelieved Father=s
testimony that he did not know Mother used drugs while pregnant, and could have
reasonably resolved the disputed facts about Father=s own
continued drug use and his alleged act of domestic violence against Father,
to  form a firm belief or conviction with
regard to endangerment under both the conduct and environment grounds.[8]
 See J.P.B., 180 S.W.3d at 573B74; see
also Tex. Fam. Code Ann. ' 161.001(1)(D),
(E); In re M.J.M.L., 31 S.W.3d 347, 351B52 (Tex.
App.CSan
Antonio 2000, pet. denied) (holding that evidence of course-of-conduct
endangerment was legally sufficient when it showed father knew mother was a
drug addict that used drugs while pregnant and abandoned soon-to-be-born baby
to her care).  And, giving due deference
to the trial court as factfinder, based on the entire record, we conclude that
the trial court could have reasonably formed a firm conviction or belief that
Father violated subsections (D) and (E) of section 161.001(1) such that the
evidence is also factually sufficient to support termination of Father=s
parental rights.  See H.R.M.,
209 S.W.3d at 108; C.H., 89 S.W.3d at 28.  We overrule Father=s first
and second issues.

C. Best Interest of the Child

There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a)
(Vernon 2002).  The following factors
should be considered, among others, in evaluating the parent=s
willingness and ability to provide the child with a safe environment:

the child=s age and physical and mental
vulnerabilities; whether there is a history of substance abuse by the child=s family
or others who have access to the child=s home;
the willingness and ability of the child=s family
to effect positive environmental and personal changes within a reasonable
period of time;








and whether the child=s family
demonstrates adequate parenting skills, including providing the child and other
children under the family=s care with minimally adequate
health and nutritional care and protection from repeated exposure to violence
even though the violence may not be directed at the child.  Id. ' 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:  the desires of the child; the emotional and
physical needs of the child now and in the future; the emotional and physical
danger to the child now and in the future; the parental abilities of the individuals
seeking custody; the programs available to assist these individuals to promote
the best interest of the child; the plans for the child by these individuals or
by the agency seeking custody; the stability of the home or proposed placement;
the acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and any excuse for the acts or omissions of
the parent.  Holley v. Adams, 544
S.W.2d 367, 371B72 (Tex. 1976).   

 

Some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

 








1. Mother

Mother contends that the evidence is factually
insufficient to support the trial court=s best
interest finding because the State presented insufficient evidence regarding
her acts or omissions constituting an emotional or physical danger to the child
or specifying acts or omissions to indicate that the existing parent-child
relationship was not proper.  Mother
specifically argues that the evidence at trial Ademonstrated
no direct threat@ to J.M.=s
emotional and physical safety.  She also
refers to her testimony that she was willing to attend drug rehabilitation,
that she had stable housing and employment, and that it was in J.M.=s best
interests that he be returned home to support her argument.








Notwithstanding Mother=s
admission that J.M. tested positive for cocaine at birthCclearly
an act constituting a physical danger to the childCthe
testimony at trial also reflected that Mother lacks the ability and the will to
provide J.M. with a safe environment and to put his best interest first.  Mother willfully violated the safety plan
that led to J.M.=s placement into foster care.[9]  She refused to leave a crack house to visit
J.M., and skipped visits with J.M. without calling, which Wells testified led
to the visits being switched to every-other-week, and finally monthly.[10]  Mother testified that her last visit with
J.M. before the June 2008 trial was in March 2008.  Wells testified that Mother=s last
visit with J.M. was in November 2007.








Mother lives with her mother and relies on her to
pay for her food and to provide her with transportation.[11]  Although Mother argues that she was able to
maintain stable housing, she also testified that she had three different
residences during the ten months following J.M.=s
removal.  Although she contends that she
made Areasonable
efforts@ to
complete her service plan, Mother also admitted that not only she did not
successfully complete her service plan, but also that she only attended a few
parenting classes; she did not do the psychological evaluation or drug
assessment, she missed visits with J.M., she failed to provide documentation of
steady employment, and she refused to take any drug tests.[12]  Mother testified that she was unemployed at
the time of trial. 

Mother acknowledged that she had no excuse for
failing to complete her service plan and stated, ANow, all
I know is I need to do them so I can do better.@  She testified that if she could have six more
months, she would complete the service plan. 
Wells testified that she did not think Mother could turn her life around
if given six more months because of Mother=s Apast
history and the fact that she=s had a
year to get it together and she hasn=t.@ 

Mother claimed that it was in J.M.=s best
interest for her to have him because she would give him love, support, and take
care of him drug-free.  She stated, AI=m just
asking for a second chance on saving myself,@ and AIt=s just I
need him . . . . He needs the love that I=m
willing to give.@ 
With regard to her plans for J.M., Mother gave the following testimony:

Q.     So if
you were to have him placed in your arms at the conclusion of this trial, where
would he go?

 

A.     He
would be with me and my mom.

 

Q.     How
would you support him?

 








A.     I=ll have to get a
job.  He will be supported.  He will be supported.  By the grace of God, he will be supported.

 

Q.     Grace
of God and what else?

 

A.     Me,
his father.

 

Q.     Okay.  You haven=t worked since March; is that correct?

 

A.     Yeah.  We=re in the process.  This is short term for us now.  Okay? 
We=re in the process of
trying to do this thing for him.

 

Q.     Why
didn=t you start this thing
for him when he was born?

 

A.     Unfortunately,
I was on drugs, ma=am.

 

Q.     Why
didn=t you start it when your
other two children were born on drugs?

 

A.     Well,
they were being provided and all.  They=re well taken care
of.  They=re ok.

 

Father testified that he had some concerns about J.M. being returned
to Mother.

Mother=s mother
has a CPS history and so was not considered an appropriate placement for
J.M.  Mother=s daughter,
C.M., was ruled out for placement when she allowed Mother to violate the safety
plan in July 2007. Mother requested Father=s sister
(ASister@) as an
alternate placement, testifying, AI know
she will be [a safe place for J.M.]. 
Just the short time me talking and visiting with her, she=s a good
person.@








J.M.=s foster
mother, a social worker with a master=s degree
in psychology, testified that she and her husband, a home theater design
technician, want to adopt J.M.  The
photographic evidence showed that J.M.=s
physical condition improved dramatically during his year with his foster
parents:  when J.M. first came into
foster care, he was frail and emaciated; after a year with his foster family,
he had gained weight and was developmentally on-target.  The foster mother testified that their home
had three bedrooms, two bathrooms, and a fenced-in backyard; J.M. has his own
bedroom. 

Wells testified that it would be in J.M.=s best
interest to terminate Mother=s
parental rights because, of those seeking custody, the foster parents had the
best parenting abilities and the most stable home, and they had safe and
healthy plans for J.M.=s future.  J.M.=s
attorney ad litem concurred, stating, AI
believe in the here and now that termination is in the best interest of the
child,@
although he criticized everyone, including the State, for failing to make more
of an effort earlier in the process to place J.M. with a family member.








Considering in particular J.M.=s age
and physical condition when CPS placed him into foster care; Mother=s
substance abuse history; her inability to make personal changes within a year
while facing termination; J.M.=s
emotional and physical needs for safety and security; Mother=s lack
of parental abilities evidenced by her testimony about her other two children
who were born with cocaine in their systems; Mother=s own
plans as compared to the State and foster parents=
adoption plan; the instability of Mother=s home
situation as compared to the stability of the foster parents= home;
and the fact that Mother admitted she had no excuse for failing to complete her
service plan, we conclude that the trial court could have reasonably formed a
firm belief or conviction that termination of Mother=s
parental rights was in J.M.=s best
interest such that the evidence is factually sufficient.  See Tex. Fam. Code Ann. ' 263.307(b);
R.R., 209 S.W.3d at 116; C.H., 89 S.W.3d at 28; Holley,
544 S.W.2d at 371B72.  We overrule Mother=s second
issue.

2. Father








Father complains that there was insufficient
evidence at trial that he would not be able to adequately provide for J.M.=s
emotional, physical, mental, or spiritual needs now or in the future.  To support his argument, he directs us to his
trial testimony that before the State placed J.M. in foster care, he would drop
by every other day to visit J.M. and Mother; that his parents or his sister
could provide love and a stable foundation for J.M.; that he completed some of
his parenting classes; and that he has not had a dirty drug test since
2004.  He also refers to his testimony
that he has three grown daughters that the State never became involved with as
evidence that he has the proper parenting skills to serve J.M.=s best
interest and to his testimony that he lives with his parents to support his
argument that he has a stable living environment.

Like Mother, the testimony at trial reflected
Father=s lack
of ability or will to provide J.M. with a safe environment and to put J.M.=s best
interest first.  With Mother, he
willfully violated the safety plan that led to J.M.=s
placement into foster care, testifying that he did not feel like they had done
anything wrong.  Father testified at
trial that he had probably not completed any of the service plan=s
components other than attending three or four parenting classes.[13]  Father deliberately violated his parole and
was incarcerated for sixty days during the pendency of the termination
case.  And Father=s focus
at trial, rather than on J.M., was on perceived injustice and disrespect shown
to him throughout the process, complaining that CPS had ignored and neglected
him.  He testified that, with regard to
the original safety service plan, A[i]t=s like I
didn=t exist.@  With regard to the meeting to create the
service plan, he stated,








I didn=t get everything that
[Mother] got or if I got that, it came later on.   And by that time I was already frustrated,
and it was like I was at a point where I almostCnot that I didn=t care for [J.M.] It=s just that I didn=t care anymore, I mean,
because I wasCI was being neglected
concerning my son.

 

He testified that having his son taken away from him made him feel A[b]elittled,
useless@ and
that having his parental rights terminated was Athe last
thing [he] need[ed] right now.@  He testified that if his rights were not
terminated, he would take the drug tests, the psychological evaluation,
parenting classes, and individual counselingCthat is,
perform the service plan that he had failed to complete during the year before
trialCand that
he would put his pride aside and do what was right for J.M.  Wells testified that it would be in J.M.=s best
interest to terminate Father=s
parental rights.

As to Father=s
parenting skills, although Father testified that he had three grown daughters
that the State never became involved with, he also testified that he only had
on-and-off contact with them and that, while they were never removed from him
by CPS, Atheir
mothers just packed up and went somewhere else.@  This was the extent of his testimony with
regard to parenting his adult daughters. 
He did not propose any of them as placements for J.M.








Father testified that he thought J.M. should be
placed with his parents, with whom he lives, or his sister, who has three
children of her own, and that they could provide a stable foundation for
J.M.  Wells testified that CPS did not
consider Father=s parents for placement because
both Father and Sister told her that their parents were abusive, that their
father abused their mother, and that it would be an inappropriate home for
J.M., and because the home was not childproofed and the grandfather told her
that he did not want J.M. and did not want a home study done.  At trial, Father denied telling CPS not to
look at placement with his parents because his father was abusive, but Sister
confirmed that her father was abusive to her stepmother and to her and Father
when they were children.

Wells testified that Father told her that he did
not approve of Sister as a placement, that Sister recently had a stroke and
could not take care of J.M., and that there was no other family member that
would be appropriate to take care of J.M. 
Father testified that he remembered telling CPS that Sister had heart
problems and that there were no other family members he would recommend for
placement, but he also stated that he had been too proud to ask Sister for help
at the time.








Sister, a forty-year-old single mother of three
children (ages seventeen, thirteen, and seven), testified that the first time a
CPS caseworker asked her to take J.M., in June 2007, she told him that she
wanted a DNA test on the baby to make sure that it was Father=s child
because she did not believe Father when he said it was his.  Sister testified that her next contact with
CPS was in April 2008 and that she asked Wells for a home study after she saw
J.M. and noticed a family resemblance.

Wells testified that she spoke with Sister about
possible placement in December 2007, and April and May 2008.  She testified that she did not do a home
study on Sister because of Sister=s health
and finances.  She also testified that
Sister did not tell her until April that she had changed her mind about taking
J.M.  Wells testified that the State
would not be willing to consider Sister now because she had already said no
twice and because of the concern about Sister=s
medical status.

Sister testified that Wells told her that she
would need a note from Sister=s
cardiologist saying that she was able to take care of an infant, because Sister
suffers from cardiomyopathy; she suffered a stroke at age thirty-three.  Sister testified that she delivered the note
to the window in Wells=s office in April and that Wells
did not contact her after that.  She
testified that she did not recall a conversation with a caseworker in which she
stated that she had three children already, could not take care of J.M., and
did not want to be home-studied.  She
admitted that she told Wells that she would cut her medications in half in
order to feed J.M., and she testified that to do so would jeopardize her
medical condition.  Sister testified that
she had another discussion in May with Wells about J.M. and that








I was angry that we had
gone to see [J.M.] . . . and we had to call and sign in and they were over an
hour late bringing him.  And they saidC[t]he lady=s response was that no
one ever comes to visit him. 

And so when I got home, I had
called [Wells] to let her know that I was upset that the worker was really
angry, really mean to us . . . . I told her I was not going to mess with her
anymore, because I tried and she keeps on giving me theCshe
doesn=t want
to respond to anything that I=m asking
her.  And I told her that I would leave
everything up to [Father] at that time, because I couldn=t get
anywhere with her.

Sister testified that she has lived with her
children in a three-bedroom apartment for four years, her current income is
$1500 per month from social security disability insurance, and half of her income
goes to expenses.  She also receives food
stamps.  She begged the trial court to
let her undergo a home study, stating, AI think
that I should have that chance.  You
know, I never had that.@ 
She also testified that Father should be given custody because he had
shown her that he could grow up and get past the things that he had done wrong
and because he would like to be his little boy=s father.








Considering the testimony at trial and the
attorney ad litem=s opinion that termination would
be in J.M.=s best interest, as well as the
variety of factors discussed above, we conclude that the trial court could have
reasonably formed a firm belief or conviction that termination of Father=s
parental rights was in J.M.=s best
interest, and therefore, that the evidence is legally and factually sufficient
to support the trial court=s
finding.  See C.H., 89 S.W.3d at
28. We overrule Father=s fourth issue.

IV. Conclusion

Having overruled all of Mother=s and
Father=s
dispositive issues,[14]
we affirm the trial court=s judgment.

 

PER
CURIAM                       

PANEL: MCCOY, J.; CAYCE, C.J.; and LIVINGSTON, J.

DELIVERED: January 15, 2009











[1]See Tex. R. App. P. 47.4.





[2]J.M.=s presumed father, R.J.,
executed an irrevocable affidavit of relinquishment of parental rights prior to
trial and he has not appealed.





[3]This was not CPS=s first intervention into
Mother=s affairs.  CPS removed her eleven-year-old daughter and
her ten-year-old son from her after both were born with cocaine in their
systems.  Including J.M., Mother has had
seven children by four men.  Three of her
children are now adults; Mother does not have legal custody of any of her minor
children.





[4]The CPS caseworker and
J.M.=s foster mother testified
that when CPS placed J.M. into foster care, the child was emaciated, frail, and
very dirty, and he had trouble keeping food down.  His skin was dry and scaly, his lips were
gray, his abdomen was distended, and his muscle tone was poor.  Photographs of J.M. when he was first placed
in foster care and one year later were submitted into evidence, showing
remarkable physical improvement. 





[5]Father testified that CPS
gave him a service plan that provided names of service providers and their
contact information and that he understood the purpose of the service plan was A[t]o try to get my son a
stable environment, a healthy environment for him to grow in, a placement, a
home, you know, with some love.@  He later
testified that he did not remember the purpose of the service plan and that he
did not recall the services he was supposed to complete.





[6]Wells admitted that there
was no police report or conviction with regard to the domestic violence
allegation.  She also noted that during
some of the visits, Mother and Father were very argumentative with each other
and Ahad to be redirected to
calm it down for the appropriateness of the child.@





[7]He also testified that he
deliberately reported late so that he could go in and seek medical assistance.





[8]That is, the trial court
could have inferred that Father knowingly allowed J.M. to remain in an
endangering environment from the fact that Mother and Father were together for
two-and-a-half years, during which time Mother was a drug user, and from the
fact that Father observed Mother suffering from symptoms of drug withdrawal
while pregnant and described her as Aripping and running and cutting up herself@ when he described their
physical altercation that landed her in the hospital.  The trial court could have inferred from the
disputed testimony about Father=s deliberate failure to report to his probation
officer, resulting in his incarceration for sixty days, Father=s drug use, and Father=s act of domestic
violence against Mother that Father had engaged in a course of conduct that
endangered J.M.=s emotional well-being.





[9]CPS did not remove J.M.
until Mother and Father took the baby after Adecid[ing] we wanted to have a day with him,@ which both Mother and
Father acknowledged violated the safety plan. 
Father testified that Mother took J.M. because her daughter was at work
and that she told him, Awell, CPS had already
came the first of that week, so they probably wouldn=t be back.@ 





[10]Mother missed a visit
with J.M. when she was in jail for making a false police report; she also
missed some visits due to her work schedule.





[11]Mother has an
eleventh-grade education and no formal job training or job skills.  She testified that she has been separated
from her husband, R.J., for three years but has not been able to financially
afford a divorce.





[12]Wells testified that
Mother told her on three separate occasions, 
September 13, January 23, and April 8, that drug tests would come back
dirty because she had used crack one or two days before. 





[13]Wells testified that she
gave Father the service plan on August 30, 2007; October 11, 2007; October 25,
2007; and December 18, 2007.  She
testified that she visited him at the jail on December 18 to talk about the
service plan.  She testified that Father
did not do the parenting classes, the drug assessment, any drug testing, the
psychological evaluation, individual counseling, batterers intervention
program, or provide any documentation of employment, and that Father was not
willing to work with her on any of the services.  Father=s last visit with J.M. was December 6, 2007,
although Father only admitted missing one visit and testified that he made four
or five.





[14]See Tex. R. App. P. 47.1.